| STATE V. TALK |
|---|

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**STATE OF NEW MEXICO,**
**Plaintiff-Appellant,**
**v.**
**COREY TALK,**
**Defendant-Appellee.**

Docket No. A-1-CA-36378
COURT OF APPEALS OF NEW MEXICO
May 21, 2019

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY, Karen L. Townsend, District Judge

**COUNSEL**

Hector H. Balderas, Attorney General, Marko D. Hananel, Assistant Attorney General, Santa Fe, NM for Appellant

Law Offices of Adrianne R. Turner, Adrianne R. Turner, Albuquerque, NM for Appellee.

**JUDGES**

LINDA M. VANZI, Judge. WE CONCUR: J. MILES HANISEE, Judge JACQUELINE R. MEDINA, Judge

**AUTHOR:** LINDA M. VANZI

**MEMORANDUM OPINION**

**VANZI, Judge.**

**{1}** The State appeals the district court's order excluding the test results of a blood draw performed pursuant to the Implied Consent Act, NMSA 1978, §§ 66-8-105 to -112 (1978, as amended through 2015), on the ground that the blood drawer was not authorized to draw Defendant Corey Talk's blood. Relying on *State v. Adams*, 2019-NMCA-___, ___ P.3d ___ (No. A-1-CA-36506, May 21, 2019), filed concurrently with this opinion, we reverse.

**BACKGROUND**

**{2}** An Aztec police officer arrested Defendant for, inter alia, driving while intoxicated (DWI) after observing him break several traffic laws and attempt to flee from the officer. The officer observed that Defendant had bloodshot, watery eyes, slurred speech, an unsteady balance, and a strong odor of alcohol on his breath. After Defendant refused to perform a field sobriety test or submit to a chemical test of his breath or blood, the officer requested and received a warrant to collect and test a sample of Defendant's blood. The officer transported Defendant to the San Juan County Regional Medical Center (the Medical Center) emergency room, where Nicole McNealy, a hospital employee, drew Defendant's blood.

**{3}** Defendant moved to exclude the blood test results on the ground that McNealy did not fall under the categories of individuals authorized to draw blood under NMSA 1978, Section 66-8-103 (1978), which provides that "[o]nly a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test." *See also* § 66-8-109(A) ("Only the persons authorized by Section 66-8-103 . . . shall withdraw blood from any person for the purpose of determining its alcohol or drug content."). Relying on *State v. Garcia*, 2016-NMCA-044, 370 P.3d 791, Defendant argued that the district court was required to exclude the blood test results because McNealy—who was licensed as an emergency medical technician (EMT)—did not fall into any of these categories. In response, the State argued that McNealy's training and experience working at the Medical Center qualified her as a laboratory technician or technologist employed by a hospital or physician for purposes of Section 66-8-103.

**{4}** At the evidentiary hearing on the motion, McNealy testified about her training and experience, as well as the procedures for legal blood draws. More detail about her testimony is included in our analysis of the State's arguments. After the hearing, the district court granted Defendant's motion to exclude and entered findings of fact and conclusions of law. The district court found that the Medical Center employed McNealy as an EMT-Intermediate and emergency department technician II, not as a laboratory technician or phlebotomist. While the district court acknowledged that the Medical Center's job description for EMTs and emergency department technicians included the responsibility to "perform Legal Blood Alcohol blood draws at the request of Law Enforcement personnel[,]" it concluded that "[t]he evidentiary foundation required for the admission of blood alcohol content test results is governed by statute and case law, not the [Medical Center]." (Alteration omitted.) As such, the district court excluded the test results because Section 66-8-103 does not specifically authorize an EMT or emergency department technician to draw blood based on the district court's reading of *Garcia*. The State timely appealed the district court's order pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972), certifying that the appeal was "not taken for purpose of delay, and the evidence is a substantial proof of a fact material in the proceeding."

**DISCUSSION**

## I.     The State May Appeal Pursuant to Section 39-3-3(B)(2)

**{5}**     Before considering the merits of the State's argument, we first determine whether the State has a right to appeal. Whether a party has a statutory right to an appeal is a question of law, which we review de novo. *State v. Armijo*, 2016-NMSC-021, ¶ 19, 375 P.3d 415. "The principal command of statutory construction is that the court should determine and effectuate the intent of the Legislature, using the plain language of the statute as the primary indicator of legislative intent." *State v. Hobbs*, 2016-NMCA-022, ¶ 9, 366 P.3d 304 (alteration, internal quotation marks, and citation omitted). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Taylor E.*, 2016-NMCA-100, ¶ 26, 385 P.3d 639.

**{6}**     Section 39-3-3(B)(2) provides, in relevant part, that the state may appeal a district court order excluding or suppressing evidence within ten days "if the district attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." Defendant cites *State v. Gomez*, 2006-NMCA-132, ¶ 7, 140 N.M. 586, 144 P.3d 145, for the proposition that the State cannot appeal the district court's exclusion of the blood test results because the State has other evidence it can use to convict Defendant of DWI (i.e., the arresting officer's observations of Defendant). However, we rejected this same argument in *Adams* because the language and reasoning relied upon from Judge Robinson's opinion in *Gomez* did not constitute the opinion of this Court. *See Adams*, 2019-NMCA-___, ¶ 11 (stating that Chief Judge Bustamante's special concurrence, which did not question the district attorney's certification under Section 39-3-3, constituted the opinion of our Court in *Gomez*). Instead, we held that the state could appeal the exclusion of the blood test results, despite having other evidence to prove the defendant's guilt, because the excluded blood test results were "important or significant." *Adams*, 2019-NMCA-___, ¶¶ 12-13 (quoting *State v. Mendez*, 2009-NMCA-060, ¶ 12, 146 N.M. 409, 211 P.3d 206, *rev'd on other grounds*, 2010-NMSC-044, ¶ 56, 148 N.M. 761, 242 P.3d 328).

**{7}**     For the same reasons, we likewise conclude that the blood test results here are "important or significant." *Id.* ¶ 12 (quoting *Mendez*, 2009-NMCA-060, ¶ 12). The State may introduce the results to show the amount of alcohol or drugs in Defendant's blood shortly after driving. *See* § 66-8-110(A) ("The results of a test performed pursuant to the Implied Consent Act may be introduced into evidence in any . . . criminal action arising out of the acts alleged to have been committed by the person tested for driving a motor vehicle while under the influence of intoxicating liquor or drugs."). As we observed in *Adams*, "Without the blood test results, the [s]tate would have to rely solely on witness testimony to demonstrate [the d]efendant's intoxication, a potentially more difficult task, given the possibility that its witnesses may become unavailable or have faded memories." 2019-NMCA-___, ¶ 13. Thus, we conclude that the blood test results are "substantial proof of a fact material" sufficient to invoke an interlocutory appeal pursuant to Section 39-3-3(B)(2).

## II. The District Court's Suppression of the Blood Test Results Constituted an Abuse of Discretion

**{8}** "We review the [district] court's decision to exclude or admit evidence for an abuse of discretion." *State v. Hanson*, 2015-NMCA-057, ¶ 5, 348 P.3d 1070. "A [district] court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Lente*, 2005-NMCA-111, ¶ 3, 138 N.M. 312, 119 P.3d 737. "We review de novo whether the district court's decision to exclude evidence was based upon a misapprehension of the law." *State v. Romero*, 2000-NMCA-029, ¶ 6, 128 N.M. 806, 999 P.2d 1038. We defer to "the district court's findings of historical fact so long as they are supported by substantial evidence." *State v. Simpson*, 2016-NMCA-070, ¶ 8, 388 P.3d 277 (internal quotation marks and citation omitted).

**{9}** On appeal, the parties repeat the arguments advanced below. We conclude that *Adams* requires reversal. We briefly summarize *Adams* and refer the parties to that opinion for a full discussion of *Garcia* and construction of Section 66-8-103. In *Adams*, addressing arguments nearly identical to those here, we rejected the defendant's argument that *Garcia* stated a categorical rule that EMTs are never authorized under Section 66-8-103 to draw blood for law enforcement purposes. *Adams*, 2019-NMCA-___, ¶ 22 ("*Garcia* does not stand for the proposition that Section 66-8-103 prohibits all EMTs from drawing blood."). We noted that the facts and arguments raised in *Garcia* presented a particular question, to wit: do EMTs fall within a sixth category of authorized persons under Section 66-8-103 as a "licensed professional"? *Adams*, 2019-NMCA-___, ¶ 22. Given *Garcia*'s analysis of this question, we concluded that *Garcia* merely stood for the proposition that an EMT license *alone* is insufficient to permit a person to draw blood under Section 66-8-103. *Adams*, 2019-NMCA-___, ¶ 22. Because the state in *Adams* did not argue that the EMT was qualified as a result of her license, but rather that the EMT qualified because of her additional training and experience, we concluded that *Garcia*'s analysis did not apply. *Id.* ¶ 21 (stating that different facts and arguments "warrant a different analysis than that of *Garcia*"). Additionally, we noted that the facts surrounding the blood draw distinguished *Adams* from *Garcia*. *Adams*, 2019-NMCA-___, ¶ 23.

**{10}** In keeping with *Adams*, we conclude that *Garcia* does not govern our analysis here because this matter is distinguishable from *Garcia*, both on the legal question presented and on the facts surrounding the blood draw. As to the legal question, the State argues not that McNealy is qualified to draw blood under Section 66-8-103 because she is licensed as an EMT, but that the Legislature intended for people with McNealy's skills and experience to fall within the category "laboratory technician" for purposes of Section 66-8-103. *See Adams*, 2019-NMCA-___, ¶ 22 (stating that *Garcia* addressed "whether the EMT's license would qualify her under the asserted (but rejected) category of 'licensed professional,' not whether an EMT with greater experience and training could potentially qualify under another enumerated category"). As to the distinguishing facts, here McNealy was employed by the Medical Center and drew Defendant's blood in a hospital setting, not in the course of emergency care, as was the case in *Garcia. Compare Adams*, 2019-NMCA-___, ¶ 23, *with Garcia*, 2016-

NMCA-044, ¶¶ 3-5. In addition, unlike *Garcia*, Defendant does not dispute that McNealy used the Scientific Laboratory Division-approved test kit to ensure the reliability of the testing. *Compare Adams*, 2019-NMCA-___, ¶ 2, *with Garcia*, 2016-NMCA-044, ¶ 5; *see* § 66-8-107 (providing that a test of blood or breath must be approved by the Scientific Laboratory Division of the Department of Health). Moreover, as we discuss next, McNealy had received training in phlebotomy and legal blood draws in addition to her EMT training. *See Adams*, 2019-NMCA-___, ¶ 21 ("Nor is there any indication that the *Garcia* EMT had any additional training or experience in drawing blood that would qualify her under any other category listed in Section 66-8-103.").

**{11}**   Having concluded that *Adams*—not *Garcia*—controls here, we proceed to determine whether McNealy was qualified under Section 66-8-103 to draw Defendant's blood for testing. In *Adams*, we construed Section 66-8-103 and concluded that, by authorizing to draw blood an undefined category of non-licensed medical personnel employed by a hospital or physician, such as laboratory technicians, "our Legislature was adopting approved medical practice." *Adams*, 2019-NMCA-___, ¶ 27. "In other words, an individual qualifies as a laboratory technician for purposes of Section 66-8-103 so long as a hospital or physician determined that she was qualified to perform blood draws in accordance with accepted medical standards based on her demonstrable skills, training, and experience." *Adams*, 2019-NMCA-___, ¶ 27. Defendant argues that reading the term "laboratory technician" in this fashion would create a catch-all category in violation of the "clear purpose of [Section 66-8-103 to] limit[] who may draw blood to specific classes of individuals." However, as we observed in *Adams*, this interpretation is in line with both the purposes of Section 66-8-103 and the Implied Consent Act as a whole, as it (1) "ensures the safety of defendants and the reliability of blood samples by limiting those authorized to draw blood to qualified individuals who have been approved by the medical community to perform such tasks" and (2) "avoids unnecessarily narrowing the class of individuals qualified to perform blood draws in aid of in the prosecution of DWI offenses." *Adams*, 2019-NMCA-___, ¶ 32.

**{12}**   The undisputed testimony demonstrates that McNealy met the standard announced in *Adams*. The district court did not make any findings of fact regarding McNealy's qualifications to draw blood in general except for finding that McNealy "[was] not employed by the [Medical Center] as a laboratory technician or as a phlebotomist." However, McNealy's title is of little importance. *See id.* ¶ 28 ("While [the EMT] did not have the title 'laboratory technician,' or work in a laboratory, these facts alone are of no moment."). Nor does McNealy's lack of any national laboratory technician certification disqualify her to draw blood under Section 66-8-103, as Defendant argues. *See Adams*, 2019-NMCA-___, ¶ 27 n.2 ("If the Legislature intended to authorize only certified laboratory technicians to draw blood under Section 66-8-103, it could have expressly included such a requirement similar to the licensure requirement for professional or practical nurses. Thus, we decline to read into the statute any additional requirement that laboratory technicians must hold a national certification." (citation omitted)). "Rather, the controlling factors are the individual's assigned duties, skills, training, and experience." *Id.* ¶ 28. To this end, the district court acknowledged that the Medical

Center's job description for McNealy's position included the responsibility for performing legal blood draws at the request of law enforcement personnel. At the time McNealy drew Defendant's blood, she had been working at the Medical Center for several years and was licensed as EMT-I, as well as an advanced EMT with the National Registry of Emergency Medical Technicians. More significantly, McNealy testified that the Medical Center trained her how to perform legal blood draws as part of her orientation, which she estimated that she had performed "more than twenty-five or thirty" times during her employment with the Medical Center. Additionally, McNealy was able to describe the specific process for performing legal blood draws in detail.

{13}    In sum, McNealy's undisputed testimony demonstrated that the Medical Center hired her to perform, inter alia, legal blood draws, trained her in legal blood draw procedures, and determined that she was qualified to perform that task. *See id.* (holding that an EMT employed by a hospital whose assigned duties included drawing blood and who had received training in drawing blood qualified as a "laboratory technician" under Section 66-8-103). Hence, McNealy falls within the meaning of "laboratory technician" for purposes of the Implied Consent Act. As the district court excluded the blood test results based upon a misapprehension of Section 66-8-103 and our case law, the district court abused its discretion.

**CONCLUSION**

{14}    For the foregoing reasons, we reverse the district court's order excluding Defendant's blood test results and remand for further proceedings consistent with this opinion.

{15}    **IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JACQUELINE R. MEDINA, Judge**