# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2019-NMCA-043**

**Filing Date: May 21, 2019**

**No. A-1-CA-36506**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellant,

**v.**

**BRIAN ADAMS,**

     Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Daylene Marsh, District Judge**

Certiorari Granted, August 9, 2019, No. S-1-SC-37722.  Released for Publication September 17, 2019.

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
John Bennett, Assistant Appellate Defender
Albuquerque, NM

for Appellee

## OPINION

**VANZI, Judge.**

**{1}**    This interlocutory appeal arises from the district court's order excluding the results of Defendant Brian Adams' blood test on the basis that the individual who drew his blood was not authorized to do so under the Implied Consent Act, NMSA 1978, §§ 66-8-105 to -112 (1978, as amended through 2015). On appeal, the State contends that

the district court abused its discretion in excluding the blood test results because the person who drew the blood was an emergency medical technician (EMT) whose additional training and experience qualified her to draw blood. We first hold that the State properly took this interlocutory appeal under NMSA 1978, Section 39-3-3(B)(2) (1972), because the blood test results constituted substantial proof of a material fact. We further hold that the EMT was qualified to draw Defendant's blood under the Implied Consent Act. As the district court based its exclusion of the blood test results on a misapprehension of our case law and the statutory requirements for who may draw blood, its exclusion constituted an abuse of discretion. Accordingly, we reverse and remand.

**BACKGROUND**

{2}     A Farmington police officer was dispatched to a local gas station after receiving a report of a possible drunk driver. Upon arriving at the gas station, the officer made contact with Defendant, who was inflating the tires of a car matching the description provided by the caller. The officer noticed Defendant had slurred speech and bloodshot, "glossy" eyes. Upon contacting the caller himself and confirming that the caller witnessed Defendant driving the vehicle, the officer had Defendant perform several field sobriety tests. During the tests, the officer observed Defendant swaying, failing to follow directions, and unable to balance on one foot. The officer also noticed Defendant's breath had a "slight odor of alcohol." Defendant admitted to drinking whiskey and taking Xanax and Suboxone earlier in the day. Based on these observations and Defendant's admission, the officer arrested Defendant for driving while intoxicated (DWI). After Defendant agreed to a blood draw pursuant to the Implied Consent Act, the officer transported Defendant to the San Juan Regional Medical Center (the Medical Center). The officer directed Danica Atwood, a hospital employee and licensed EMT, to perform the blood draw using a sealed blood draw kit. The Scientific Laboratory Division of the New Mexico Department of Health (SLD) subsequently tested Defendant's blood, which tested negative for alcohol but positive for marijuana-related metabolites, benzodiazepines, and synthetic opioids.

{3}     The State charged Defendant with one count of non-aggravated DWI, in violation of NMSA 1978, Section 66-8-102 (2016). Defendant moved to suppress the blood test results on the basis that Atwood was not qualified to perform blood draws under NMSA 1978, Section 66-8-103 (1978), which provides that "[o]nly a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test." After the magistrate court denied his motion to suppress, Defendant pleaded no contest, reserving his right to appeal the magistrate court's decision not to suppress the blood test results.

{4}     On appeal, the district court held an evidentiary hearing, during which Defendant argued that the district court should suppress the blood test results based on *State v. Garcia*, 2016-NMCA-044, ¶ 1, 370 P.3d 791 (holding that a licensed EMT did not fit within the statutory categories of persons "authorized to draw blood for the purpose of

determining its alcohol or drug content under the Implied Consent Act"). In response, the State argued that, although an EMT license alone was not sufficient to qualify Atwood to draw blood pursuant to Section 66-8-103, her additional experience and training qualified her to do so as a laboratory technician or technologist. In support of the State's argument, Atwood testified to the following. At the time she drew Defendant's blood, Atwood held an EMT-basic license, and had been employed as an EMT and emergency department technician in the Medical Center emergency room for approximately four months. Atwood's job duties included drawing blood for medical laboratory testing, as well as performing blood draws at the request of law enforcement personnel. She worked three twelve-hour shifts per week and would draw blood from twenty-five people on average each shift. Atwood testified that, after initially being trained by other technicians and nurses in the manner in which blood is drawn at the Medical Center, she performed blood draws under supervision for six weeks until hospital personnel determined that she was competent to perform blood draws unsupervised. On cross-examination, Atwood confirmed that she never worked in a laboratory and that she was not licensed or certified as a phlebotomist.

**{5}**     Although Atwood stated that she never received any specific training pursuant to the Implied Consent Act, she explained some of the differences between drawing blood for medical laboratory testing and drawing blood for law enforcement purposes. For medical blood draws, technicians could draw blood out of an IV line, clean the puncture site with alcohol, and give the sample to another hospital employee for transport to a laboratory for testing. However, for "legal" blood draws, technicians had to clean the puncture site with a non-alcoholic substance, such as iodine, use the collection tubes provided by the officer, and hand the tubes directly to the officer after completing the draw. Atwood testified that she collected Defendant's blood using an unexpired, SLD-approved blood collection kit in accordance with the kit's instructions.

**{6}**     After the hearing, the district court granted Defendant's motion to suppress and entered findings of fact and conclusions of law. The district court found that

> Defendant's blood was drawn by Danica Atwood, a hospital employee employed in dual capacities as an [EMT] and as an "Emergency Department Technician." Ms. Atwood's training as an Emergency Department Technician included on-the-job training in drawing blood, which, according to the [Medical Center's] policy and procedures qualified her to do "legal alcohol blood draws at the request of law enforcement personnel."

However, the district court concluded that this Court's "categorical holding" in *Garcia*, 2016-NMCA-044, ¶ 20, "that a person's 'license as an EMT does not qualify her to draw blood to determine its alcohol or drug content under the Implied Consent Act[,]' " precluded a ruling that Atwood was the same or similar to a laboratory technician for purposes of Section 66-8-103. As such, the district court excluded the blood test results. The State timely appealed the district court's order pursuant to Section 39-3-3(B)(2),

certifying that the appeal was "not taken for purpose of delay, and the evidence is a substantial proof of a fact material in the proceeding."

## DISCUSSION

### I.  The State May Appeal Pursuant to Section 39-3-3(B)(2)

**{7}**  Before considering the merits of the State's argument, we must determine the threshold issue of whether the State has a right to appeal. Defendant contends that the State cannot appeal the district court's exclusion of the blood test results because the State has other evidence it can use to convict Defendant of DWI. We disagree.

**{8}**  "A court's jurisdiction derives from a statute or constitutional provision." *State v. Armijo*, 2016-NMSC-021, ¶ 19, 375 P.3d 415 (internal quotation marks and citation omitted). Whether a party has a statutory right to an appeal is a question of law, which we review de novo. *Id.* "The principal command of statutory construction is that the court should determine and effectuate the intent of the Legislature, using the plain language of the statute as the primary indicator of legislative intent." *State v. Hobbs*, 2016-NMCA-022, ¶ 9, 366 P.3d 304 (alteration, internal quotation marks, and citation omitted). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Taylor E.*, 2016-NMCA-100, ¶ 26, 385 P.3d 639 (internal quotation marks and citation omitted).

**{9}**  Section 39-3-3(B)(2) provides, in pertinent part,

> In any criminal proceeding in district court an appeal may be taken by the state to the [S]upreme [C]ourt or [C]ourt of [A]ppeals, as appellate jurisdiction may be vested by law in these courts . . . within ten days from a decision or order of a district court suppressing or excluding evidence . . . , if the district attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

Defendant does not dispute that the State timely filed in the district court a certification compliant with Section 39-3-3(B)(2), or question the State's motives for taking this appeal. Rather, Defendant contends that the blood test results are not "substantial proof of a fact material in the proceeding" because the State could still prove its case without them. *See id.* Specifically, Defendant claims that because the officer and the caller could testify as to their observations of Defendant, including his performance on the field sobriety tests and admission to drinking alcohol and taking prescription drugs, the State could still prove its case without the blood test results by demonstrating that Defendant was "impair[ed] to the slightest degree." *See* § 66-8-102(A) ("It is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state."); *State v. Gurule*, 2011-NMCA-042, ¶ 7, 149 N.M. 599, 252 P.3d 823 ("In order to convict under [Section 66-8-102](A), a court must find that the defendant was less able to the slightest degree, either mentally or physically, or both, to exercise the clear

judgment and steady hand necessary to handle a vehicle with safety to the driver and the public as a result of drinking the liquor." (internal quotation marks and citation omitted)); *see State v. Neal*, 2008-NMCA-008, ¶ 27, 143 N.M. 341, 176 P.3d 330 ("Given the testimony as to [the d]efendant's driving behavior, physical condition, admission of drinking, and performance on the field sobriety tests, the factfinder could rely on common knowledge and experience to determine whether [the d]efendant was under the influence of alcohol.").

**{10}**   Defendant reads *State v. Gomez*, 2006-NMCA-132, ¶ 7, 140 N.M. 586, 144 P.3d 145, to stand for the proposition that the State cannot appeal the exclusion of evidence unless the exclusion would "make it impossible for the State to prove the elements of its case." Defendant's understanding of *Gomez* is flawed. In *Gomez*, the State sought to invoke Section 39-3-3(B)(2) as a basis to appeal the district court's midtrial order excluding the defendant's blood test results. *Gomez*, 2006-NMCA-132, ¶ 3. On appeal, Judge Robinson, authoring the lead opinion, reasoned that because the defendant admitted to drinking and the arresting officer observed him exhibit behaviors indicative of intoxication, the State did not need the blood test results to prove that the defendant was guilty of DWI under the "impaired to the slightest degree" standard. *See id.* ¶¶ 6-7. As a result, Judge Robinson concluded that the state could not appeal the exclusion of the blood test results because they "did not go to the heart of the proof required to establish DWI." *Id.* ¶ 7.

**{11}**   Importantly, however, neither of the other panel members joined in Judge Robinson's opinion. *See id.* ¶ 22 (Bustamante, C.J., specially concurring) ("I concur in the result of Judge Robinson's opinion."); *id.* ¶ 44 (Fry, J., specially concurring) ("I concur in the result of Judge Robinson's opinion, but I do not agree with the rationale supporting the result. I concur fully in Chief Judge Bustamante's concurring opinion."). Thus, Chief Judge Bustamante's special concurrence constituted the opinion of our Court, not Judge Robinson's opinion. *See State v. Mendez*, 2009-NMCA-060, ¶ 11, 146 N.M. 409, 211 P.3d 206 ("[W]e observe that the special concurrences of Judges Bustamante and Fry in *Gomez* constitute the opinion of this Court."), *rev'd on other grounds*, 2010-NMSC-044, ¶ 56, 148 N.M. 761, 242 P.3d 328; *see also Commonwealth v. Hopkins*, A.3d 1133, 1139 (Pa. 2017) (recognizing that a lead opinion written by one judge "lack[s] the force of precedent" where the two other panelists do not join in its reasoning). Notably, Chief Judge Bustamante specifically declined to address the merits of the district attorney's certification, instead holding that "Section 39-3-3(B)(2) does not provide an automatic appeal from suppression or exclusionary orders entered after jeopardy has attached in a trial." *Gomez*, 2006-NMCA-132, ¶¶ 22, 42-43 (Bustamante, C.J., specially concurring). As the timing of the State's appeal is not an issue in the instant case, Defendant's reliance on *Gomez* is unavailing.

**{12}**   Defendant also cites *State v. Vasquez*, 2014-NMSC-010, 326 P.3d 447, and *State v. Romero*, 2000-NMCA-029, 128 N.M. 806, 999 P.2d 1038, in support of his argument that the exclusion of evidence must essentially "ma[k]e it impossible for the State to prove an element of its case." *Romero*, 2000-NMCA-029, ¶ 9. However, we do not read these cases as holding that the State may only appeal pursuant to Section 39-

3-3(B)(2) when it cannot possibly convict without the excluded evidence. Indeed, we later clarified the substantive standard in *Romero* by explaining, "[W]e do not read *Romero* as allowing the state to appeal only when the district court's ruling makes it impossible for the state to prove its case. Rather, we interpret *Romero* as requiring that the excluded evidence be important or significant, as opposed to evidence of minor consequence." *Mendez*, 2009-NMCA-060, ¶ 12. Nor did *Vasquez* alter this standard, as the parties in that case did not dispute whether the state could proceed without the excluded evidence. *See* 2014-NMSC-010, ¶ 28 ("[T]he State could not proceed with its prosecution without the[ excluded] witnesses, and no one claims otherwise."). Consequently, our Supreme Court had no occasion to consider the issue on certiorari review. *See State v. Sanchez*, 2015-NMSC-018, ¶ 26, 350 P.3d 1169 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)). Thus, Defendant's argument that the State may only appeal when the district court's evidentiary ruling makes it impossible to prove its case finds no support in either *Romero* or *Vasquez*.

**{13}** We conclude that Defendant's blood test results are "important or significant" under the circumstances of this case. *See Mendez*, 2009-NMCA-060, ¶ 12. In order to prove that Defendant was intoxicated under Section 66-8-102, the State must demonstrate beyond a reasonable doubt that Defendant (1) "was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the driver and the public as a result of drinking . . . liquor[,]" *Gurule*, 2011-NMCA-042, ¶ 7; *see* § 66-8-102(A); (2) was under the influence of drugs to a degree that rendered him incapable of safely driving a vehicle, *see* § 66-8-102(B); or (3) had an alcohol concentration of eight one hundredths or more in his breath or blood within three hours of driving as the result of liquor consumed before or while driving, *see* § 66-8-102(C)(1). To this end, the State has the option to introduce the blood test results to demonstrate the amount of alcohol or drugs in his blood. *See* § 66-8-110(A) ("The results of a test performed pursuant to the Implied Consent Act may be introduced into evidence in any . . . criminal action arising out of the acts alleged to have been committed by the person tested for driving a motor vehicle while under the influence of intoxicating liquor or drugs."). While the test results here did not register any blood alcohol content, Defendant's blood tested positive for marijuana-related metabolites, benzodiazepines, and synthetic opioids. Without the blood test results, the State would have to rely solely on witness testimony to demonstrate Defendant's intoxication, a potentially more difficult task, given the possibility that its witnesses may become unavailable or have faded memories. Nor is it clear that, without the benefit of the test results, the State would be able to muster sufficient proof that Defendant had ingested marijuana, as he only admitted to drinking liquor and taking prescription drugs. Furthermore, as Defendant only admitted to taking prescription drugs earlier in the day, the test results were necessary to prove the amount of drugs remaining in his system at the time of arrest in order to show that he was still impaired. Thus, we conclude that the blood test results constitute "substantial proof of a fact material" sufficient to allow an interlocutory appeal pursuant to Section 39-3-3(B)(2).

## II.   The District Court's Suppression of the Blood Test Results Constituted an Abuse of Discretion

**{14}**   The State argues that the district court abused its discretion by holding that Atwood was not authorized to draw Defendant's blood under the Implied Consent Act based on her status as an EMT. Specifically, the State contends that the district court misinterpreted *Garcia* as precluding a finding that Atwood was authorized to draw blood under the Implied Consent Act, and asserts that Atwood's training and experience are sufficient to qualify her as a laboratory technician or technologist under Section 66-8-103. We agree.

**{15}**   "We review the [district] court's decision to exclude or admit evidence for an abuse of discretion." *State v. Hanson*, 2015-NMCA-057, ¶ 5, 348 P.3d 1070. "A [district] court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Lente*, 2005-NMCA-111, ¶ 3, 138 N.M. 312, 119 P.3d 737 "We review de novo whether the district court's decision to exclude evidence was based upon a misapprehension of the law." *Romero*, 2000-NMCA-029, ¶ 6.

### A.   *Garcia* Does Not Require Exclusion of Defendant's Blood Test Results

**{16}**   The Implied Consent Act provides that every motorist in this state, upon being arrested for DWI, is deemed to have consented to a chemical test to determine the drug or alcohol content of his or her blood. Section 66-8-107(A); *see In re Suazo*, 1994-NMSC-070, ¶ 7, 117 N.M. 785, 877 P.2d 1088. Any chemical test performed pursuant to the Implied Consent Act must be approved by the SLD and administered at the direction of a law enforcement officer. Section 66-8-107(B). The Legislature restricted the classes of persons authorized to draw blood for chemical tests performed pursuant to the Implied Consent Act. *See* § 66-8-109(A) ("Only the persons authorized by Section 66-8-103 . . . shall withdraw blood from any person for the purpose of determining its alcohol or drug content."). Section 66-8-103 delineates the categories of persons authorized to perform blood draws under the Implied Consent Act: "Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test." Section 66-8-103 serves the dual purposes of ensuring "the safety of the subject and the reliability of the sample." *State v. Wiberg*, 1988-NMCA-022, ¶ 14, 107 N.M. 152, 754 P.2d 529. Our Court has upheld the exclusion of blood test results when the blood sample is drawn by an individual who does not fall within any of the statutorily enumerated categories of authorized blood drawers. *See, e.g.*, *Garcia*, 2016-NMCA-044, ¶ 23 ("The State failed to meet its burden of proving that [the d]efendant's blood was drawn by a person authorized to do so under Section 66-8-103, and the results of the test are therefore inadmissible.").

**{17}**   We addressed Section 66-8-103 most recently in *Garcia*, where we affirmed the district court's exclusion of blood test results obtained as the result of a blood draw performed by an EMT while she was treating the defendant in an ambulance following an accident. 2016-NMCA-044, ¶¶ 3-5, 24. As a result of a head-on collision, the

defendant in that case suffered injuries and had to be transported to the hospital via ambulance. *Id.* ¶ 3. After the responding officer noticed signs of intoxication, the officer asked an EMT in the ambulance to draw the defendant's blood. *Id.* The officer provided the EMT with an SLD-approved blood draw kit. *Id.* ¶ 4. However, the EMT did not read the kit's instructions or use the needle included in the kit because she wanted "[t]o avoid compromising [the d]efendant's care, which was her first priority[.]" *Id.* ¶ 5. Instead, the EMT used a sterile IV catheter and syringe from the ambulance's supply. *Id.* After SLD determined that the defendant's blood sample contained marijuana-related metabolites, the State charged the defendant with causing great bodily harm by vehicle while driving under the influence of drugs or alcohol. *Id.* ¶¶ 5-6. The district court granted the defendant's motion to suppress the blood test results on the ground that the EMT was not qualified to perform blood draws. *Id.* ¶ 7.

**{18}** On appeal, the State argued that the EMT qualified under Section 66-8-103 as a "licensed professional." *Garcia*, 2016-NMCA-044, ¶ 11. After surveying several related cases from New Mexico and other states, *id.* ¶¶ 12-17, we turned to the language of our statute and concluded that Section 66-8-103 established five distinct categories of individuals qualified to withdraw blood pursuant to the Implied Consent Act: (1) physicians, (2) licensed professional nurses, (3) licensed practical nurses; (4) laboratory technicians (employed by a hospital or physician),[1] and (5) technologists (employed by a hospital or physician). *Garcia*, 2016-NMCA-044, ¶¶ 18-19. Thus, we held that "[t]here is no separate category of a 'licensed professional,' as urged by the State[,] . . . and since [the EMT] d[id] not satisfy any of the categories that are listed as the 'only' ones qualified to draw blood samples she [was] not qualified under the Implied Consent Act." *Id.* ¶ 19.

**{19}** We continued by adding that, even if there were a separate category of "licensed professional," the EMT's license did not qualify her to draw blood under the Implied Consent Act. *Id.* ¶ 20. In arriving at this conclusion, we noted that the EMT was employed by an ambulance company licensed to provide "emergency medical services," which were defined as "the services rendered by providers in response to an individual's need for immediate medical care to prevent loss of life or aggravation of physical or psychological illness or injury." *Id.* ¶ 20 (quoting NMSA 1978, § 24-10B-3(K) (2003)); *see generally* Emergency Medical Services Act, NMSA 1978, §§ 24-10B-1 to -13 (1983, as amended through 2014). Within this statutory framework, we concluded that the EMT's license allowed her to perform blood draws, "but only in the context of providing . . . services rendered 'in response to an individual's need for immediate medical care to prevent loss of life or aggravation of physical or psychological illness or

---

1 *Garcia* suggested, but did not hold, that a laboratory technician must be employed by a hospital or physician. *See* 2016-NMCA-044, ¶ 18 ("Because we have found no applicable separate statutory definition for a 'laboratory technician' and given the structure of the phrase, it appears that a laboratory technician must be employed by a hospital or physician to qualify. However, that question is not before us in this case."). We agree with *Garcia* that Section 66-8-103 appears to require a hospital or physician to employ the laboratory technician. Nonetheless, as Defendant does not dispute that Atwood worked in a hospital, we assume, without deciding, that Section 66-8-103 requires a laboratory technician to be employed by a hospital or physician.

injury.' " *Garcia*, 2016-NMCA-044, ¶¶ 21-22 (quoting § 24-10B-3(K)). We also noted that the general EMT training did "not include the protocols for performing blood draws that comply with the [SLD] regulations . . . under the Implied Consent Act." *Id.* ¶ 22. Given these facts, we held that the EMT's licensure "did not authorize her to draw blood for the purpose of determining its alcohol or drug content." *Id.*

{20}    Here, Defendant contends, and the district court concluded, that *Garcia* is outcome determinative on the question of whether Atwood, a licensed EMT, is authorized to draw blood under Section 66-8-103. The State, on the other hand, argues that *Garcia* does not preclude a determination that Atwood is authorized to draw blood on the basis of her additional training and experience because *Garcia*, as the State puts it, "merely held that an individual's EMT license *alone* did not entitle her to membership in any of the categories of individuals authorized to draw blood under Section 66-8-103." (Emphasis added.) We find the State's argument to be persuasive.

{21}    The distinguishable facts presented and arguments made in the instant case warrant a different analysis than that of *Garcia*, which did not address the question whether an EMT can qualify as a laboratory technician or technologist employed by a hospital or physician based on the EMT's additional training and experience. Unlike *Garcia*, the State, here, is not arguing that Atwood is qualified to draw blood under Section 66-8-103 simply because she holds an EMT license. Rather, the State is arguing that Atwood's license, *combined with her experience and training*, qualifies her as a laboratory technician or technologist. We had no occasion to address this argument in *Garcia*, as the State only argued in that case that the EMT qualified under a separate category set forth in Section 66-8-103 (i.e., a "licensed professional"). *See Garcia*, 2016-NMCA-044, ¶ 11. There is no indication that the state in *Garcia* argued that the EMT qualified as a laboratory technician or technologist employed by a hospital or physician. Nor is there any indication that the *Garcia* EMT had any additional training or experience in drawing blood that would qualify her under any other category listed in Section 66-8-103.

{22}    Rather, this Court in *Garcia* merely addressed the issue of whether an EMT license, *by itself*, qualified an individual to perform blood draws under Section 66-8-103. After determining that Section 66-8-103 did not contain a sixth category of authorized blood drawers, i.e., one covering "licensed professionals," we stated, "*Even if we were able to accept the State's argument for a separate category of a 'licensed professional,'* [the EMT's] license as an EMT does not qualify her to draw blood . . . under the Implied Consent Act." *Garcia*, 2016-NMCA-044, ¶¶ 19-20 (emphasis added). Thus, it is clear we were addressing whether the EMT's license would qualify her under the asserted (but rejected) category of "licensed professional," not whether an EMT with greater experience and training could potentially qualify under another enumerated category. Therefore, *Garcia* does not stand for the proposition that Section 66-8-103 prohibits all EMTs from drawing blood. *See Sanchez*, 2015-NMSC-018, ¶ 26 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)).

**{23}** Moreover, the facts of *Garcia* are distinguishable. While both cases involve EMTs, the circumstances of the blood draws involved in each case could not be more different. Unlike *Garcia*, there is no evidence that Atwood sacrificed the reliability of the test results because she was treating Defendant for injuries. *See* 2016-NMCA-044, ¶ 5. While it was unclear how much experience the *Garcia* EMT had with blood draws, Atwood testified that she typically performed approximately twenty-five blood draws each shift. Perhaps most importantly, Atwood drew Defendant's blood in a hospital setting using an SLD-approved test kit, unlike the makeshift, ambulance-based blood draw involved in *Garcia*. *See id.* ¶¶ 3-5. These differences are significant, as they demonstrate that Atwood had significantly more experience than the *Garcia* EMT in drawing blood for purposes of the Implied Consent Act and that the blood sample used here was inherently more reliable than the one used in *Garcia*. In light of the foregoing, we conclude that *Garcia* does not dictate the result of this case.

**B.      Atwood Is Authorized to Draw Blood Under Section 66-8-103**

**{24}** We turn now to the merits of the State's contention that Atwood qualifies as either a laboratory technician or a technologist under Section 66-8-103 based on her additional experience and training. In order to answer this question, we must determine what the Legislature intended in using the terms "laboratory technician" and "technologist." We begin with the term "laboratory technician."

**{25}** "The primary goal in construing a statute is to ascertain and give effect to the intent of the Legislature." *State v. Holt*, 2016-NMSC-011, ¶ 10, 368 P.3d 409 (internal quotation marks and citation omitted). "In doing so, we first look to the words the Legislature chose and the plain meaning of the language." *State v. Ramos-Arenas*, 2012-NMCA-117, ¶ 6, 290 P.3d 733 (internal quotation marks and citation omitted). "The words of a statute, including terms not statutorily defined, should be given their ordinary meaning absent clear and express legislative intention to the contrary." *Id.* (internal quotation marks and citation omitted). "We reject a mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute. When interpreting a statute, we are also informed by the history, background, and overall structure of the statute, as well as its function within a comprehensive legislative scheme." *State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183 (internal quotation marks and citations omitted).

**{26}** There is no statutory or regulatory definition of "laboratory technician." Moreover, unlike physicians or nurses, New Mexico does not have a statutory or regulatory licensing requirement for laboratory technicians. *See generally* Medical Practice Act, NMSA 1978, §§ 61-6-1 to -35 (1923, as amended through 2017) (providing licensure requirements and penalties for practicing medicine without a license); Nursing Practice Act, NMSA 1978, §§ 61-3-1 to -31 (1968, as amended through 2019) (providing licensure requirements and penalties for practicing nursing without a license). "In the absence of a statutory definition, we rely on a dictionary definition to determine the meaning of the language used." *City of Eunice v. N.M. Taxation & Revenue Dep't*, 2014-NMCA-085, ¶ 14, 331 P.3d 986. "Technician" is generally defined as "one who

has acquired the technique of an . . . area of specialization." *Technician*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *State v. Webster*, 726 P.2d 831, 833 (Nev. 1986) ("We note that 'technician' is generally used in a generic sense. A technician is one versed or skilled in the technical details of a subject or art." (alteration, internal quotation marks, and citation omitted)). Thus, a laboratory technician is a person who has acquired the technique of an area of specialization suitable for working in a laboratory setting. More specifically, in the context of Section 66-8-103, which only pertains to blood draws, the specialized skill required is that of drawing blood. *See* NMSA 1978, § 12-2A-2 (1997) ("Unless a word or phrase is defined in the statute or rule being construed, its meaning is determined by its context, the rules of grammar and common usage. A word or phrase that has acquired a technical or particular meaning in a particular context has that meaning if it is used in that context."); *Janet v. Marshall*, 2013-NMCA-037, ¶ 9, 296 P.3d 1253 ("We look at the plain meaning of the words used in the context of the statutory text as a whole." (internal quotation marks and citation omitted)).

**{27}** New Mexico courts have not previously addressed the requirements for qualification as a laboratory technician under Section 66-8-103. However, several other states have addressed similar issues in determining when and under what circumstances an individual qualifies as a statutorily undefined and unlicensed professional for purposes of their counterpart implied consent laws and concluded that the proper indicator is whether the medical community accepted the individual's training and experience as adequate for the position. *See, e.g., State v. Masteller*, 198 N.W.2d 503, 504 (S.D. 1972) ("In authorizing laboratory technicians, medical technicians, and medical technologists to withdraw blood samples our statute merely adopts approved medical practice. It assures the individual that blood sampling will be performed by trained medical personnel in clinical surroundings. Our legislature was obviously aware that some hospital, clinic, laboratory, or physician would be responsible for the training, qualifications, and competence of medical assistants employed and supervised by them to perform the routine task of withdrawing a blood sample. No other standard is needed for the protection of the individual or the preservation of the purity of the blood sample."); *see also, e.g., People v. Randle*, 148, 538 N.E.2d 1253, 1255 (Ill. App. Ct. 1989) ("Illinois has no formal licensing requirements for becoming a phlebotomist. It does not seem pragmatic, then, for a court to impose a higher standard for phlebotomists than that standard imposed by the health care industry. If hospitals, physicians and other medical people, all who bear heavy responsibility for the lives and health of those in their care, see fit to trust [the phlebotomist] to follow correct medical procedures, it makes little sense for courts to find [the phlebotomist] untrained and unqualified."); *State v. Winquist*, 247 N.W.2d 256, 259 (Iowa 1976) ("The test to determine whether a person holding himself out as a medical technologist is a medical technologist . . . is whether a satisfactory showing can be made that he has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards."); *Holler v. N. Dakota Dep't of Transp. Dir.*, 470 N.W.2d 616, 617 (N.D. 1991) ("Where there is no statutory requirement of licensure or educational or training standards, the test for determining

whether the person is a qualified technician is whether a satisfactory showing can be made that the technician has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards." (footnote omitted) (citing *Winquist*, 247 N.W.2d at 259)); *Masteller*, 198 N.W.2d at 504 (noting that the statute authorizing laboratory technicians, medical technicians, and medical technologists to withdraw blood samples merely adopts approved medical practice and assures the individual that blood sampling will be performed by trained medical personnel in clinical surroundings. And further providing that "[n]o other standard is needed for the protection of the individual or the preservation of the purity of the blood sample."); *State v. Bingham*, 921 S.W.2d 494, 496 (Tex. Ct. App. 1996) ("The common-sense interpretation of the term 'qualified technician[]' . . . must include a phlebotomist who a hospital or other medical facility has determined to be qualified in the technical job of venesection or phlebotomy, i.e., the drawing of blood."). We find the logic in this line of cases persuasive and similarly conclude that in authorizing laboratory technicians employed by a hospital or physician to withdraw blood under the Implied Consent Act—irrespective of their licensure status—our Legislature was adopting approved medical practice. In other words, an individual qualifies as a laboratory technician for purposes of Section 66-8-103 so long as a hospital or physician determined that she was qualified to perform blood draws in accordance with accepted medical standards based on her demonstrable skills, training, and experience.[2]

{28}    While Atwood did not have the title "laboratory technician," or work in a laboratory, these facts alone are of no moment. Rather, the controlling factors are the individual's assigned duties, skills, training, and experience. *See State v. Stegman*, 203 P.3d 52, 58 (Kan. Ct. App. 2009) ("If the person in question has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards, then . . . that person is a phlebotomist regardless of whether he or she is called a 'phlebotomist' by his or her employer."); *see*

---

2 We recognize that national organizations offer certifications for laboratory technicians. *See generally* Bureau of Labor Statistics, U.S. Dep't of Labor, Occupational Outlook Handbook: *How to Become a Medical and Clinical Laboratory Technologist or Technician*, https://www.bls.gov/ooh/healthcare/ medical-and-clinical-laboratory-technologists-and-technicians.htm#tab-4 (last visited Apr. 22, 2019) (providing information on obtaining medical laboratory technician certifications). However, because New Mexico does not require laboratory technicians to hold any such certification and because Section 66-8-103 does not specify that laboratory technicians must be licensed or certified, we do not believe the Legislature intended to authorize only laboratory technicians holding a national certification to draw blood under the Implied Consent Act. If the Legislature intended to authorize only certified laboratory technicians to draw blood under Section 66-8-103, it could have expressly included such a requirement similar to the licensure requirement for professional or practical nurses. *See State v. Ramos*, 2013-NMSC-031, ¶ 15, 305 P.3d 921 (noting that when the Legislature knew how to include something, and did not, the courts assume the choice was deliberate). Thus, we decline to read into the statute any additional requirement that laboratory technicians must hold a national certification. *See State v. Hubble*, 2009-NMSC-014, ¶ 10, 146 N.M. 70, 206 P.3d 579 ("We will not read into a statute language which is not there, especially when it makes sense as it is written.").

*also Arizona ex rel. Pennartz v. Olcavage*, 30 P.3d 649, 655 n.4 (Ariz. Ct. App. 2001) (emphasizing that "it is the training and experience that makes a person 'qualified'—not the title itself"); *People v. Jenne*, 425 N.W.2d 116, 117 (Mich. Ct. App. 1988) (concluding that an individual qualified as a "medical technician" because of her training despite having a different title); *Krause v. State*, 405 S.W.3d 82, 86 (Tex. Crim. App. 2013) ("The record also confirms that, functionally, [the blood drawer] was not emergency medical services personnel. It is true that [she] had training in general emergency procedures. She also was licensed as an EMT-I and had that title at the hospital. But that training and her license and title had little to do with what she actually did at the hospital, which was almost exclusively drawing blood." (emphasis omitted)). Thus, we hold that an individual qualifies as a laboratory technician, despite her official title, if she has sufficient skills, training, and experience to assure a hospital or physician that she is qualified to perform blood draws in accordance with approved medical practice.

{29}    Turning to the facts of this case, we conclude that Atwood's assigned duties, skills, training, and experience qualify her to draw blood under Section 66-8-103. As the district court found, "Atwood's training as an [e]mergency [d]epartment [t]echnician included on-the-job training in drawing blood, which, according to the [Medical Center's] policy and procedures qualified her to do 'legal alcohol blood draws at the request of law enforcement personnel.' " Atwood had been employed by the Medical Center as an EMT and emergency room technician for approximately four months at the time she drew Defendant's blood. Atwood's assigned duties included drawing blood for legal and medical laboratory testing, a task she was called on to do roughly twenty-five times per shift, on average. Atwood received training from other technicians and nurses in drawing blood, and the Medical Center determined she was competent to perform draws unsupervised. Finally, Atwood confirmed, and Defendant does not dispute, that the blood draw was properly performed in accordance with the SLD-approved blood draw kit instructions. Based on this showing, we conclude that Atwood qualifies as a laboratory technician under Section 66-8-103. Accordingly, we hold that the district court abused its discretion in excluding the blood test results.

{30}    The regulations promulgated by the SLD bolster our holding. The Legislature has shown significant deference to the SLD's expertise in terms of ensuring the reliability of tests taken pursuant to the Implied Consent Act. *See* NMSA 1978, § 24-1-22(A) (2003) ("The [SLD] is authorized to promulgate and approve satisfactory techniques or methods to test persons believed to be operating a motor vehicle . . . under the influence of drugs or alcohol and to issue certification for test operators and their instructors that shall be subject to termination or revocation at the discretion of the [SLD]."); § 24-1-22(B) ("The [SLD] shall establish criteria and specifications for equipment, training, quality control, testing methodology, blood-breath relationships and the certification of operators, instructors and collectors of breath samples."); § 24-1-22(C) ("All laboratories analyzing breath, blood or urine samples pursuant to the provisions of the Implied Consent Act . . . shall be certified by the [SLD]."). In light of this deference, the fact that SLD regulations provide that "[t]he term laboratory technician shall include phlebotomists" is particularly persuasive. 7.33.2.15(A)(1) NMAC; *see*

*Kirkpatrick v. Bd. of Cty. Comm'rs of Santa Fe Cty.*, 2009-NMCA-110, ¶ 11, 147 N.M. 127, 217 P.3d 613 (stating that one of our rules of statutory interpretation is to "give persuasive weight to long-standing administrative constructions of statutes by the agency charged with administering them" (internal quotation marks and citation omitted)). Granted, like the term "laboratory technician," "phlebotomist" is also undefined by statute or regulation. Nor is there a state licensing requirement for phlebotomists. Rather, the term "phlebotomist" is generally used in a generic sense to refer to those who practice phlebotomy, which is defined as "the letting of blood for transfusion, diagnosis, or experiment[.]" *Phlebotomy*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see Pennartz*, 30 P.3d at 655 ("[A] phlebotomist, by definition, is a person who, through training or experience, is competent to draw blood."). Given Atwood's testimony that she regularly performed blood draws as part of her duties at the Medical Center, we conclude that she qualifies as a phlebotomist, a status which SLD considers to be in the same vein as laboratory technicians.

**{31}** We find unavailing Defendant's remaining argument that Atwood is not qualified to draw blood under Section 66-8-103 because she does not work in a role that permits or requires her to test bodily fluids. Nowhere in the Implied Consent Act is there any indication that a blood drawer is expected or required to perform the blood-alcohol analysis. Indeed, by regulation, "[t]he blood samples *shall* be delivered to SLD or a laboratory certified by SLD to conduct tests for alcohol or other drug content." 7.33.2.15(A)(4) NMAC (emphasis added). Thus, the fact that Atwood does not have the knowledge or authority to test the blood sample is irrelevant.

**{32}** The result we reach today is in line with the purposes of Section 66-8-103, as well as the Implied Consent Act as a whole. Our decision ensures the safety of defendants and the reliability of blood samples by limiting those authorized to draw blood to qualified individuals who have been approved by the medical community to perform such tasks. *See Wiberg*, 1988-NMCA-022, ¶ 14 (stating that the purpose of Section 66-8-103 is to ensure "the safety of the subject and the reliability of the sample"). At the same time, our decision also avoids unnecessarily narrowing the class of individuals qualified to perform blood draws in aid of the prosecution of DWI offenses. *See Wiberg*, 1988-NMCA-022, ¶ 13 (rejecting a construction of the Implied Consent Act urged by the defense that "would significantly and unnecessarily limit the classes of individuals who could assist in furthering the statute's legislative purpose" of deterring drunk drivers and removing them from the highways).

**{33}** Finally, we note that defendants may always challenge the admissibility of a blood test based upon concerns that the individual performing the blood draw did not follow the proper procedures. However, as Defendant does not dispute that Atwood followed the instructions in the SLD-approved blood draw kit in gathering his blood sample in this case, we need not address any such issue here. Given our conclusion, we need not address whether Atwood also qualifies under Section 66-8-103 as a technologist.

**CONCLUSION**

**{34}** For the forgoing reasons, we reverse the district court's order excluding Defendant's blood test results and remand for further proceedings consistent with this opinion.

**{35}  IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JACQUELINE R. MEDINA, Judge**